UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| THOMAS GLINSKI,  Plaintiff, | : : : | |
| v. | : : : | CIVIL ACTION NO. 3:01cv1167 (SRU) |
| NATIONAL SURETY CORP.,  Defendant. | : : : | |

## MEMORANDUM OF DECISION

Thomas Glinski and Joseph Carlson, both employees of the airline servicing company AMR Combs, crashed into each other while driving airplane refueling vehicles. Glinski sued Carlson in state court for negligence. Glinski now seeks a declaratory judgment from this court that any damages owed him on account of Carlson's negligence must be paid by National Surety Corp. ("National") under the uninsured motorist provision of the policy National issued to AMR Combs ("the Policy"). National counters that the Connecticut Workers' Compensation Act bars Glinski from recovering damages from Carlson and, even if it did not, Glinski is not insured by National's policy. National is correct. Consequently judgment will enter in its favor.

**I.     Findings of Fact**

This case was tried to the court over two days. Based on my review of the evidence, I make the following findings of fact.

   A.     The Accident

In 1998, Glinski and Carlson were both employed by AMR Combs at Bradley International Airport ("Bradley Airport") in Windsor Locks, Connecticut. On November 14, 1998, both men were driving airplane refueling trucks, known as "Dart refuelers." At approximately 1:00 P.M. the two Dart refuelers collided with one another, seriously injuring

Glinksi. The collision occurred on the tarmac of the airport, i.e., the area generally used by aircraft for taxiing, parking, loading, and refueling. The tarmac is a restricted area not open to the general public.

    B.    The Dart Refueler

In order to make a legal determination whether Carlson's alleged negligence while operating a Dart refueler is excepted from the Workers' Compensation Act or covered by National's policy, it is necessary to go into some detail about the Dart refueler's design and capabilities, a subject on which both parties presented expert testimony.

In many ways the Dart refuelers at issue here resemble standard tanker trucks. Each consists of a straight chassis bearing a driver's cab and elongated storage tank and is propelled on rubber tires by a combustion engine. A Dart contains most of the features one would expect on a standard commercial vehicle, such as a suspension system, commercial brakes, turn signal lights, headlights, brakelights, a speedometer, standard steering, mirrors, and bumpers.

Despite these similarities to an ordinary commercial vehicle, a Dart differs from a typical tanker truck in several significant ways. Fully loaded a Dart weighs approximately 90,000 pounds. Given that it possesses only one rear axle, as opposed to the two or three rear axles common on most commercial tankers, a fully loaded Dart is well over the per-axle weight limit for commercial vehicles. The Dart carries aviation fuel in a tank that is not as sturdy as those found in standard road transports. A Dart is wider than a standard road vehicle and as a consequence cannot, without a permit, be driven on a public highway. The suspension system on a Dart is a simple spring suspension with no shock absorbers. In addition, a Dart cannot, without modification, exceed a speed of approximately 25 miles per hour. Fully loaded, a Dart cannot

sustain even that speed without risking tire blowout and brake failure. Moreover, much of the piping of a Dart is unprotected and would risk damage were the Dart driven at higher speeds.

The two Darts involved in Glinski and Carlson's accident, which were 1969 and 1970 models, were not significantly different from the standard model.[1]

Based on these subsidiary findings, I make the following general finding, the relevance of which will be made clear by the conclusions of law that follow. The Darts driven by Glinski and Carlson were not designed to be driven outside an airport tarmac. This finding is based on the various aspects of the Darts' design – notably, overweighted axles when loaded, minimal suspension, unprotected piping, and relatively lightweight tanks – that indicate that the vehicles were intended to be driven at low speeds in a controlled environment. This finding is also based on the fact that the sole use of Dart refuelers is, not surprisingly, the refueling of aircraft, which is generally performed only at airports.

C.   The Policy

National issued AMR Combs an insurance policy that, among other things, provided uninsured motorist coverage of up to $1,000,000 for each accident. The Policy provides, in relevant part, the following coverage:

> We will pay all sums the **insured** is legally entitled to recover as compensatory damages from the owner or driver of an **uninsured motor vehicle**. The damages must result from **bodily injury** sustained by the **insured** caused by an **accident**.

The bolded terms are defined at other places in the policy.

---

[1] The only peculiarity of the Darts in question is that, though ordinarily the speed of a Dart is limited by its transmission, the Darts in this case apparently had their speed regulated by governors. The difference is not material.

The parties do not dispute that, within the meaning of the Policy, Glinski was in an "accident" and suffered "bodily injury."

An "insured" includes, among other things, anyone "occupying a covered **auto**." An "auto" refers to a "land motor vehicle, trailer or semi-trailer designed for travel on public roads . . . ."

An "uninsured motor vehicle" means "a land motor vehicle or trailer . . . to which no liability bond or policy applies at the time of the accident. . . . [H]owever, **uninsured motor vehicle** does not include any vehicle . . . [d]esigned for use mainly off public roads while not on public roads."

The Policy also contains the following exclusion:

> This policy shall exclude all losses, except . . . any uninsured/underinsured motorists . . coverage[] where statutorily required, arising out of all accidents which occur while any vehicle is being operated on the "tarmac" of any airport.
>
> "Tarmac" is defined as the roads, aprons, or runways used by airplanes for taxiing, parking, taking off and loading.

## II. Conclusions of Law

In order to show that he is covered by the Policy, Glinksi attempts to establish the following:

>    (1) Glinski has a legal entitlement to recover compensatory damages from Carlson, if Carlson was negligent;
>
>    (2) Glinski was in a "covered auto" at the time of the accident; and
>
>    (3) Carlson was in an "uninsured motor vehicle" at the time of the accident.

As a preliminary matter, it appears paradoxical to propose that Glinski could have been in

a covered auto, yet Carlson in an uninsured motor vehicle. They were, after all, both driving Darts owned by the same company, so it seems natural that both of them would be either covered or not covered. What leads to the coverage disparity, according to Glinski, is the "tarmac" exclusion.

Glinski argues that Darts are, in general, covered autos – a contention taken up below. Assuming that to be true, then both Glinski and Carlson were "insureds" under the Policy. It is undisputed that both Glinski and Carlson were on the "tarmac" at the time of the accident. Under the tarmac exclusion, because both were on the tarmac, National did not insure any of their losses *except* uninsured motorist losses.[2] Accordingly, because Carlson was on the tarmac, National was not responsible for any loss *caused* by him. This put Carlson's Dart in the category of "uninsured motor vehicle," even though Carlson was driving what was technically a "covered auto." Nevertheless, because the tarmac exclusion exempts uninsured motorist coverage, Glinski – who was "insured" by reason of driving a "covered auto" – was entitled to recover from National precisely because National *was not responsible* for loss caused by Carlson's Dart. In short, Glinski's argument is that by excluding all liability except uninsured motorist liability, the tarmac exclusion essentially turned all of AMR Combs's Darts on the tarmac into uninsured motor vehicles whose drivers had uninsured motorist coverage. Consequently, when one of these insurance oddities hit another, the driver could collect uninsured motorist coverage.

National does not dispute the soundness of this reasoning. In fact, National does not dispute – at least in this litigation – that if Glinski proves the three elements just set forth he is

---

[2] It is not disputed that AMR Combs was required by Connecticut law to carry uninsured motorist coverage. See Conn. Gen. Stat. § 38a-336.

entitled to coverage (assuming in state court he succeeds at proving Carlson's negligence).
National's argument is simply that, regardless of the theoretical possibility of coverage, Glinski
is not covered because:

    (1) Under the Workers' Compensation Act Glinski is not entitled to recover compensatory damages from Carlson, his fellow employee, even if Carlson was negligent;

    (2) Even if Glinksi could recover from Carlson, Glinski is not insured because a Dart is not a "covered auto" under the Policy; and

    (3) Even if Glinski is insured, a Dart is not an "uninsured motor vehicle," and so Glinski's accident is not covered by the Policy.

    A.    <u>Workers' Compensation Exclusion</u>

National argues that because Glinski was covered by the Connecticut Workers' Compensation Act, he is not entitled to recover from Carlson, his fellow employee, for negligence in the Dart accident. Glinski does not deny the applicability of the Workers' Compensation Act to him, but argues that he is nonetheless permitted to sue Carlson because Carlson's actions fall under the "motor vehicle" exception to the prohibition of suits against fellow employees.

    The Connecticut Worker's Compensation Act states:

> If an employee or, in case of his death, his dependent has a right to benefits or compensation under this chapter on account of injury or death from injury caused by negligence or wrong of a fellow employee, such right shall be the exclusive remedy of such injured employee or dependent and no action may be brought against such fellow employee unless such wrong was wilful or malicious or the action is based on the fellow employee's negligence in the operation of a motor vehicle as defined in section 14-1.

-6-


Conn. Gen. Stat. § 31-293a. The Act goes on to specify:

> For purposes of this section, contractors' mobile equipment such as bulldozers, powershovels, rollers, graders or scrapers, farm machinery, cranes, diggers, forklifts, pumps, generators, air compressors, drills or other similar equipment designed for use principally off public roads are not "motor vehicles" if the claimed injury involving such equipment occurred at the worksite on or after October 1, 1983.

Id.

A "motor vehicle" is defined in Connecticut General Statutes § 14-1 as follows:

> "Motor vehicle" means any vehicle propelled or drawn by any nonmuscular power, except . . . special mobile equipment as defined in subsection (i) of section 14-165 and any other vehicle not suitable for operation on a highway.

"Special mobile equipment" refers, in pertinent part, to:

> a vehicle not designed for the transportation of persons or property upon a highway and only incidentally operated or moved over a highway . . . . The term does not include house trailers, dump trucks, truck-mounted transit mixers, cranes or shovels, or other vehicles designed for the transportation of persons or property to which machinery has been attached.

Conn. Gen. Stat. § 14-165(9).

Finally, "highway" refers to:

> any state or other public highway, road, street, avenue, alley, driveway, parkway or place, under the control of the state or any political subdivision of the state, dedicated, appropriated or opened to public travel or other use

Conn. Gen. Stat. § 14-1(a)(34).

Glinski makes the difficult argument that the Dart driven by Carlson was a "motor vehicle" within the meaning of section 14-1 and therefore within the meaning of section 31-293a. In the first place, Glinski argues that the airport tarmac is a "highway," and so clearly the Dart was designed for used on a "highway." Even if the tarmac were not a highway, continues

Glinski, the Dart is a motor-powered vehicle and is neither "special mobile equipment" nor "not suitable for operation on a highway" – thus, it is a "motor vehicle."

As a preliminary matter, the tarmac is not a "highway." The section 14-1 definition of "highway" has been held by the Connecticut Supreme Court to accord with the general proposition that "the essential feature of a highway is that is a way over which the public has the right to pass . . . in contradistinction to a private way, over which only a limited number of persons have the right to pass." Wamphassuc Point Property Owners Assoc. v. Public Utilities Commission, 154 Conn. 675, 680 (1967). The Bradley Airport tarmac is not open to the general public; it is restricted to authorized personnel. Consequently, it is not a "highway."

The remainder of Glinski's argument is disposed of by my finding of fact that the Dart driven by Carlson was intended for use only on the airport tarmac. Accordingly, the Dart in question is "contractor's special equipment" as defined by section 31-293a because it is "designed for use principally off public roads" and "the claimed injury involving such equipment occurred at the worksite." Moreover, the Dart is also "special mobile equipment" as defined by section 14-165 because it is "a vehicle not designed for the transportation of persons or property upon a highway." Either circumstance standing alone puts Carlson's Dart outside the "motor vehicle" exception to section 14-165.[3] Accordingly, the Workers' Compensation Act bars

---

[3] The parties debated at length whether a Dart is capable, physically or legally, of driving on a public road. The answer to that question is beside the point. A vehicle *capable* of highway driving may nevertheless not be *designed* for such use. See Pinheiro v. Board of Education of the Town of West Hartford, 30 Conn. App. 263, 272 (1993) ("Most of the vehicles specifically excluded from the definition of motor vehicle in § 14-1(a)(47) are certainly capable of being operated on a highway but are nonetheless not suitable for such use because of their design."); Ferreira v. Pisaturo, 41 Conn. Supp. 326, 346-47 (Super. Ct. 1989) (vehicle not "'suitable for operation on a highway' even though, incidental to the main purpose for which they were designed, they do in fact operate on the highway for limited purposes). Thus, even assuming

Glinski's claim against Carlson for negligence in the Dart accident.

    B.    <u>Covered Auto</u>

National also argues that, even if Glinski had a cause of action against Carlson, National would not be responsible for any coverage because Glinski was not driving a "covered auto" at the time of the accident and therefore was not insured under the Policy.

As set forth above, the Policy insured anyone "occupying a covered auto," and auto refers to a "land motor vehicle, trailer or semi-trailer designed for travel on public roads . . . ." Because I find that the Dart driven by Glinski was not designed for travel on public roads, National is correct that Glinski was not in a "covered auto" at the time of the accident. Accordingly, Glinski was not insured by the Policy.

    C.    <u>Uninsured Motor Vehicle</u>

Finally, National argues that, even were Glinski insured, the uninsured motorist provision of the Policy did not cover the accident because Carlson was not driving an uninsured motor vehicle.

As set forth above, according to the Policy "uninsured motor vehicle does not include any vehicle . . . [d]esigned for use mainly off public roads while not on public roads." Because I find that the Dart driven by Carlson was designed for use mainly off public roads, and because the accident occurred on the Bradley Airport tarmac, which is not a public road, National is correct that Carlson was not driving an "uninsured motor vehicle" at the time of the accident. Accordingly, the Policy does not cover the accident.

---

Carlson's Dart was capable of driving on a highway, my factual finding that it was not designed for that purpose remains unchanged.

For the aforementioned reasons, I find in favor of National on all of Glinski's claims for relief set forth in his Complaint. The clerk shall enter judgment and close the file.

It is so ordered.

Dated at Bridgeport, Connecticut, this 19th day of July 2004.

                                              /s/ Stefan R. Underhill
                                              Stefan R. Underhill
                                              United States District Judge